## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE HILL, LISA SCHEMES, LATASHA TAYLOR, RONNIE HEIMBACH, JR. and VANESSA HEIMBACH individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FLAGSTAR BANK, FSB, FLAGSTAR REINSURANCE COMPANY, GENWORTH MORTGAGE INSURANCE CORP., REPUBLIC MORTGAGE INSURANCE CO., MORTGAGE GUARANTY INSURANCE CORP., and RADIAN GUARANTY INC.<br><br>Defendants. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      Defendant Flagstar Bank, FSB ("Flagstar Bank"), together with its affiliated reinsurer, Defendant Flagstar Reinsurance Company ("Flagstar RE") (collectively, "Flagstar"), have acted in concert with Defendants Genworth Mortgage Insurance Corp., Republic Mortgage Insurance Co., Mortgage Guaranty Insurance Corp. and Radian Guaranty Inc. (collectively, the "Private Mortgage Insurers") (together with Flagstar, "Defendants") to effectuate a captive reinsurance scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal payments for the referral of private mortgage insurance business from the Private Mortgage Insurers to Flagstar RE, a wholly owned subsidiary Flagstar Bancorp, Inc.; and (b) Flagstar RE received an unlawful split of private mortgage insurance premiums paid by the Private Mortgage Insurers' customers referred by Flagstar entities.

2.      This is a proposed nationwide action brought by Plaintiffs Christine Hill, Lisa

Schemes, LaTasha Taylor, Ronnie Heimbach, Jr. and Vanessa Heimbach (collectively, "Plaintiffs") on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Flagstar Bank, or any of their subsidiaries and/or affiliates, between January 1, 2004 and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Flagstar's captive mortgage reinsurance arrangements (hereinafter, the "Class").

3.      Captive reinsurance schemes, such as the scheme involving Defendants described herein, have been widespread throughout the mortgage lending marketplace. As *American Banker* magazine recently reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk." *See* Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction,* American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/ mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html,    attached    as    Exhibit    A (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say,* American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/issues/176_173/mortgage-reinsurance-respa-kickbacks-hud- investigation-doj-1041928-1.html, attached as Exhibit B (hereinafter referred to as "Reinsurance Kickbacks").[1]

---

[1]      In fact, "Bank of America recently spent $34 million to settle a RESPA class action suit accusing Countrywide of taking the same mortgage insurance kickbacks alleged by HUD investigators."    *See* Reinsurance Kickbacks.    *See also* Final Approval Order, *Alston v.*

4.      As described in greater detail below, this was accomplished through a secretive "pay-to-play scheme"[2] that utilized carefully crafted excess-of-loss or "purported" quota-share reinsurance contracts that minimized risk exposure to bands of losses unlikely to be pierced. Further, as described below, even with regard to the purported band of exposure, certain lenders, including Flagstar Bank, insulated themselves from providing any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into the trusts supporting the reinsurance contracts; and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage Kickback Scheme.

5.      As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs . . . .

*See* Mortgage Kickback Scheme.

6.      In other words, these lenders—including Flagstar Bank—were "playing with the house's money" with no risk of meaningful losses.  As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners.  In other words, it appeared to be a no-lose proposition for the banks.

*See* Mortgage Kickback Scheme.

7.      In this action, Plaintiffs challenge Defendants' hidden scheme to circumvent

---

*Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa. July 29, 2011), ECF No. 149.

[2]      *Id.*

RESPA's strict prohibition against kickbacks, referral payments and unearned fee splits and seek statutory damages and/or restitution for Defendants' unjust enrichment. Each Defendant participated in the scheme.

8.     Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance. *See* http://www.privatemi.com. Private mortgage insurance protects the lender in the event of a default by the borrower. *Id. See also* Exhibit C hereto at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements," discussing the purpose of private mortgage insurance. Although the premium is paid by the borrower (either directly or indirectly, as further described below), borrowers typically have no opportunity to comparison-shop or select the provider of the private mortgage insurance. *See* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

9.     Section 2607(a) of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance. Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home. Similarly, Section 2607(a) of RESPA prohibits providers of private mortgage insurance from giving kickbacks or referrals fees to providers of real estate settlement services, including lenders and their affiliates. Accordingly, it is unlawful for providers of private mortgage insurance to pay referral fees to lenders and their affiliates.

10.     Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance— from any person providing a real estate settlement service, including providers of private

mortgage insurance, other than for services actually performed.  Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(b) of RESPA prohibits providers of private mortgage insurance from giving any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders and their affiliates, other than for services actually performed.  Accordingly, it is unlawful for providers of private mortgage insurance to pay unearned fee splits to lenders and their affiliates.

11.     Defendants have engaged in a single, coordinated scheme designed to circumvent RESPA's prohibition against kickbacks, referral payments and unearned fee splits.  Pursuant to the scheme, each Private Mortgage Insurer pays a portion of borrowers' private mortgage insurance premiums to Flagstar RE in the form of purported "reinsurance" premiums.

12.     While these payments to Flagstar RE are purportedly for "reinsurance" services, Flagstar RE receives these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.  From the beginning of 2004 through the end of 2011, Flagstar RE collected from the Private Mortgage Insurers at least $32.5 million as its "share" of borrower's private mortgage insurance premiums.  In contrast, Flagstar RE's "share" of paid claims during this time period was only approximately $438,000. *See* Schedule F – Part 3 from the 2004-2010 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by Flagstar Credit, Inc./Flagstar RE).

13.     In this action, Plaintiffs contend that, due to the *structure* of Defendants' captive reinsurance arrangements, and the essential terms missing therein, such arrangements were a

sham and in violation of RESPA.

14.     This unitary scheme was effectuated over time, with all Defendants acting in concert.  Flagstar entered into virtually identical contracts with each and every one of the defendant Private Mortgage Insurers.  Flagstar Bank and Flagstar RE, along with the Private Mortgage Insurers, all actively participated in this single scheme.  Upon information and belief, the Private Mortgage Insurers effectively had no choice but to enter into virtually identical reinsurance contracts with Flagstar RE or risk losing business.  Flagstar had sole control over the contours of the reinsurance arrangements at issue and replicated the same arrangement with each and every Private Mortgage Insurer.  Each of the Private Mortgage Insurers chose to participate in the scheme and to pay kickbacks and/or referral fees to Flagstar because it was in their own best interest.

15.     Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiffs and the class.  *See generally*, 12 U.S.C. § 2601(b).

16.     This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of the Plaintiffs' mortgage loan transactions are located in this district, and/or a substantial part of the events giving rise to the claims

6

occurred in this district.

## PARTIES

**<u>Plaintiffs</u>**

19.     Plaintiffs Christine Hill ("Hill") and Lisa Schemes ("Schemes") obtained a mortgage loan from Flagstar Bank on or about December 13, 2005, for the purchase of their home located in Philadelphia, PA.  In connection with this loan, Plaintiffs Hill and Schemes were required to pay for private mortgage insurance in the amount of $61.00 per month.  Their Private Mortgage Insurer, Radian Guaranty, Inc. ("Radian"), was selected by their lender and, upon information and belief, was a provider with whom Flagstar had a captive reinsurance arrangement.

20.     Upon information and belief, the mortgage loan obtained by Plaintiffs Hill and Schemes was included within Flagstar's captive reinsurance program.   Plaintiffs Hill and Schemes obtained a conventional, 6.875% fixed rate mortgage loan.  Further, paragraph 10 of their Mortgage discusses "Mortgage Insurance" and notes the following, in relevant part:

> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.
>
> ***
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed 'captive reinsurance.'

21.     Plaintiff LaTasha Taylor ("Taylor") obtained a mortgage loan from Flagstar Bank on or about June 7, 2007 for the purchase of her home located in Philadelphia, PA.   In

connection with this loan, Plaintiff Taylor was required to pay for private mortgage insurance in the amount of $94.98 per month.  Her Private Mortgage Insurer, Mortgage Guarantee Insurance Corp. ("MGIC"), was selected by her lender and, upon information and belief, was a provider with whom Flagstar had a captive reinsurance arrangement.

22.     Upon information and belief, the mortgage loan obtained by Plaintiff Taylor was included within Flagstar's captive reinsurance program.    Plaintiff Taylor obtained a conventional, 6.375% fixed rate mortgage loan.  Further, paragraph 10 of her Mortgage discusses "Mortgage Insurance" and notes the following, in relevant part:

> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.
>
> ***
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed 'captive reinsurance.'

23.     Plaintiffs Ronnie and Vanessa Heimbach (the "Heimbachs") obtained a mortgage loan from Flagstar Bank on or about May 31, 2005, for the purchase of their home located in Bethlehem, PA.  In connection with this loan, the Heimbachs were required to pay for private mortgage insurance in the amount of $94.89 per month.  Their Private Mortgage Insurer, MGIC, was selected by their lender and, upon information and belief, was a provider with whom Flagstar had a captive reinsurance arrangement.

24.     Upon information and belief, the mortgage loan obtained by the Heimbachs was included within Flagstar's captive reinsurance program.    The Heimbachs obtained a

conventional, 5.875% fixed rate mortgage loan.   Further, paragraph 10 of their Mortgage

discusses "Mortgage Insurance" and notes the following, in relevant part:

> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.
>
> ***
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed 'captive reinsurance.'

## Defendants

### Flagstar Defendants

25.   Defendant Flagstar Bank is a federally chartered stock savings bank, and is the

principal subsidiary of Flagstar Bancorp, Inc.  *See* Exhibit D (excerpts from Flagstar Bancorp,

Inc.'s 2010 Annual Report).  Flagstar is the largest publically held savings bank in the Midwest,

operating banking centers or "retail home loan centers" in at least 13 states, and originating or

purchasing loans throughout the 50 United States.  *See* Exhibit D.  Flagstar Bank's headquarters

are located in Michigan.  *See* Exhibit D.

26.   Defendant Flagstar RE is also a wholly-owned subsidiary of Flagstar Bancorp,

Inc.  *See* Exhibit E, Ex. 21 hereto (excerpts from Flagstar Bancorp, Inc.'s 2010 10-K).  Flagstar

RE was incorporated in the State of Vermont on September 4, 2007. It is an active Vermont

corporation and captive reinsurer regulated by the Vermont Department of Banking, Insurance,

Securities and Health Care Administration.  *See* Exhibit F hereto (Vermont Secretary of State

Corporation Information); Exhibit G hereto (excerpts from the 2008 Annual Report of the

9

Vermont Insurance Commissioner Year Ended December 31, 2008).  Flagstar Re is the successor

in interest to Flagstar Credit, Inc. See Exhibit H hereto (excerpt from Flagstar Bancorp, Inc. 2007

Form 10-k at 8)  which was incorporated in the State of Michigan on June 26, 1995 as FSB

Emergency Corporation #37, became Flagstar Credit, Inc. on October 17, 1997 and was

dissolved on November 30, 2007.  See Exhibit I hereto (selected Flagstar Credit, Inc. corporate

filings, State of Michigan.)  Any reference herein to Flagstar RE should be understood to include

its predecessor in interest Flagstar Credit, Inc.

### The Private Mortgage Insurer Defendants

27.     Defendant Genworth Mortgage Insurance Corp. ("Genworth") is a North Carolina

corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business

throughout the United States.  According to the Annual Statements filed by Genworth with the

NAIC, Genworth ceded premiums to Defendant Flagstar RE each and every year from and

including 2005 up to and through 2010.

28.     Defendant Republic Mortgage Insurance Co. ("Republic") is a North Carolina

corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted

business throughout the United States.  According to the Annual Statements filed by Republic

with the NAIC, Republic ceded premiums to Defendant Flagstar RE each and every year from

and including 2004 up to and through 2008.

29.     Defendant MGIC is a Wisconsin corporation headquartered in Milwaukee, WI,

and, during the Class Period, conducted business throughout the United States. According to the

Annual Statements filed by MGIC with the NAIC, MGIC ceded premiums to Defendant Flagstar

RE, each and every year from and including 2004 up to and through 2009.

30.     Defendant Radian is a Pennsylvania corporation headquartered in Philadelphia,

PA, and, during the Class Period, conducted business throughout the United States. According to the Annual Statements filed by Radian with the NAIC, Radian ceded premiums to Defendant Flagstar RE, each and every year from and including 2004 up to and through 2009.

31.     Each Defendant is a proper party to this action as each Defendant participated in the same coordinated, unitary scheme alleged herein and was a provider or recipient of the unlawful kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for the referral of private mortgage insurance or any portion of an unearned fee and, further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

**FACTUAL ALLEGATIONS**

<u>**Flagstar's Operations**</u>

32.     Flagstar Bank is one of the largest regional banks in the United States, delivering a wide array of banking services to individual consumers and businesses doing business in Michigan and throughout the country.  Flagstar Bank originates and services, and, during the Class Period, has originated and serviced, residential real estate loans throughout the country through.  *See generally* Exhibit D.

33.     According to its last Annual Report, Flagstar originates residential mortgages, home equity lines and loans in all 50 states.  Mortgage loans generally represented loans collateralized by one-to-four-family residential real estate and were made to borrowers in good credit standing.  The loans were typically sold to primary mortgage market aggregators (Fannie Mae, Freddie Mac, Ginnie Mae, or the Federal Home Loan Banks) and other third-party

11

investors.  Significant revenue streams included net interest income earned on portfolio loans and loans held for sale, as well as loan sale and servicing revenue.  *Id*.

34.     At the apex of its mortgage origination business, Flagstar achieved the 11th (2009-2010) ranking amongst the top mortgage originators in the United States.  *See* INSIDE MORTGAGE FINANCE PUBLICATIONS, INC., THE 2011 MORTGAGE MARKET STATISTICAL ANNUAL-VOL. I, at 59-70 (2011), attached hereto as Exhibit J.

**Private Mortgage Insurance Industry**

35.     Each of the Defendant Private Mortgage Insurers provides or provided mortgage insurance for the protection of residential mortgage lenders such as Flagstar Bank and was a party to a captive reinsurance agreement with Flagstar RE.

36.     The private mortgage insurance industry began with the founding of Defendant Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and the other Defendant Private Mortgage Insurers, including Genworth Mortgage Insurance Corp., Republic Mortgage Insurance Co., and Radian Guaranty Inc.  Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").  *See* http://www.privatemi.com/news/ index.cfm.  According to its website, MICA's members include each of the foregoing insurers.  *See* http://www.privatemi.com/about.cfm.

37.     According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007.  *See* http://www.privatemi.com/about.cfm.

38.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%)

being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

39.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.  *See also* Exhibit C at 1-2, discussing the purpose of mortgage insurance.

40.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *Id*.

41.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.   *See* http://www.privatemi.com/tools resources/faqs.cfm.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

42.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

43.     Borrowers generally have no opportunity to comparison-shop for private

mortgage insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance, rather than negotiated between the borrower and the provider of private mortgage insurance.  *See, e.g.,* http://www.privatemi.com/toolsresources/faqs.cfm.  *See also* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

44.     Private mortgage insurance is limited to the conventional home loan market.  Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration, the Department of Veterans Affairs and the Department of Agriculture maintain their own form of mortgage default insurance.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

**RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies**

45.     RESPA is the primary federal law regulating residential mortgage settlement services and/or business incident to real estate settlement services.  For most of the Class Period, the United States Department of Housing and Urban Development ("HUD") was charged with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA.  *See* Regulation X, 24 C.F.R. § 3500.

46.     As of July 21, 2011, RESPA is now administered and enforced by the Consumer Financial Protection Bureau ("CFPB").  The CFPB was established by the Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act).  *See* Dodd-Frank Act §§ 1002(12)(M), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. §§ 5481(12)(M), 5514(b)-(c), and 5515(b)-(c).

47.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers and/or providers of business incident to real estate settlement services.  "It is the purpose of this chapter to effect certain

changes in the settlement process for residential real estate that will result . . . in the elimination

of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement

services." 12 U.S.C. § 2601(b).

48.     A key component of RESPA is its dual prohibition of referral fees and fee-

splitting between persons involved in real estate settlement services.

49.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback,
> or thing of value pursuant to any contract or understanding, oral or
> otherwise, that business incident to or a part of a real estate
> settlement service involving a federally related mortgage loan shall
> be referred to any person.

50.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split,
> or percentage of any charge made or received for the rendering of a
> real estate settlement service in connection with a transaction
> involving a federally related mortgage loan other than for services
> actually performed.

51.     Regulation X further explains, "A charge by a person for which no or nominal

services are performed or for which duplicative fees are charged is an unearned fee and violates

this section." 24 C.F.R. § 3500.14(c).

52.     The term "thing of value" is broadly defined in RESPA and further described in

Regulation X as including:

> [W]ithout  limitation,  monies,  things,  discounts,  salaries,
> commissions, fees, duplicate payments of a charge, stock,
> dividends, distributions of partnership profits, franchise royalties,
> credits representing monies that may be paid at a future date, the
> opportunity to participate in a money-making program, retained or
> increased earnings, increased equity in a parent or subsidiary entity
> . . . . The term payment is used as synonymous with the giving or
> receiving any "thing of value" and does not require transfer of
> money.

24. C.F.R. § 3500.14(d).

53.     Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance."  24 C.F.R. § 3500.2(b).

54.     Under RESPA, therefore: (a) Flagstar is prohibited from accepting referral fees from a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private Mortgage Insurers other than for services actually performed by the captive reinsurer; and (b) the Private Mortgage Insurers are prohibited from paying referral fees to Flagstar or from paying to Flagstar any split of private mortgage insurance premiums other than for services actually performed by the captive reinsurer.

**Mortgage Reinsurance**

55.     Beginning in the mid to late 1990s, mortgage companies began looking for ways to capitalize on the booming profitability of the private mortgage insurance market.  *See* Exhibit K hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance* (Mar. 23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml).

56.     In order to "share in these profits," large lenders typically created reinsurance subsidiaries to enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically agreed to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  *Id*.  In return for guaranteeing a steady stream of business, the private mortgage insurer ceded to the reinsurer a portion of the premiums it received from borrowers with respect to the loans involved.

57.     Mortgage reinsurance arrangements can generally take one of two forms: (a)

16

"quota share" or (b) "excess-of-loss."

58.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract.  However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.[3]

59.     In contrast to the typical quota share arrangement, where the private mortgage insurer and reinsurer are *expected* to share losses beginning with the first dollar of loss paid, in an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and

---

[3]     As noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113.   However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap*** . . . a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit L hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).

ends when such losses reach the detachment point.

60.     An excess-of-loss arrangement does not, however, necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer as required by RESPA.  Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

61.     Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum,* Winter 2006, at 282-283, attached as Exhibit M; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, attached as Exhibit N.

62.     The likelihood of the reinsurer experiencing any real losses (as opposed to merely paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (*i.e.,* whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the reinsurer to any real possibility that it may be *required* to contribute its *own* money when called upon by the primary private mortgage insurer to pay for its share of losses.  The absence of any likelihood that the reinsurer will experience any real losses,

in turn, reveals the reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.   Such an arrangement does not constitute real, risk-transferring or commensurately priced reinsurance.

**Captive Mortgage Reinsurance Arrangements**

63.     Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  *See* Reinsurance Kickbacks.

64.     However, mortgage lenders such as Flagstar Bank, seeking to capitalize on the hundreds of millions of dollars their borrowers pay to private mortgage insurers in premiums each year, entered into a scheme with the Defendant Private Mortgage Insurers to establish an affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the [Defendant Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools).  *See* Mortgage Kickback Scheme; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached as Exhibit O.

65.     Lender captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates, funds and/or originates through correspondent lending and which include private mortgage insurance.   Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

19

66.     Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters." *See* Reinsurance Kickbacks.

67.     This is because some lenders, including Flagstar Bank, collaborated with private mortgage insurers to create lucrative excess-of-loss and/or quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk. As American *Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it.   The problem was how they split up the risks and rewards of insuring homeowners' mortgages." *See* Reinsurance Kickbacks.

68.     Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims. *See, e.g.*, Exhibit C at 4, discussing the use of a trust fund.

69.     Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

*See* Exhibit C at 3.

70.     Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *See* Exhibit C at 3.  Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be released as dividends to the captive reinsurer.  Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims, paid out to cover administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

71.     Typically, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as Flagstar's contracts with the Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract.  *See* Reinsurance Kickbacks.

72.     While the captive reinsurer is facially required to maintain the trust fund's net assets at a level required by state law (typically, upon information and belief, 10% of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through, *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.  *See* Reinsurance Kickbacks.

73.     Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage insurer—no matter what state law or regulation, or even other portions of the reinsurance

contracts, require.   This is accomplished either through concurrent contractual provisions expressly providing that the captive reinsurer and its affiliates have no exposure for the failure to adequately fund the trusts or through an unwritten understanding of the parties.  *See, e.g.*, Exhibit P hereto at 10 (excerpts from MGIC Investment Corp.'s 2007 Form 10-K, noting that "[t]he captive's ultimate liability is limited to the assets in the trust account."); Exhibit Q hereto at 23 (excerpts from Genworth Financial Inc.'s 2011 Form 10-K, noting that "[o]nce the captive reinsurance or trust assets are exhausted, we are responsible for any additional losses incurred."); Exhibit R hereto at 31 (excerpts from Genworth Financial Inc.'s 2006 Form 10-K, noting "[h]owever, we cannot ensure that each captive with which we do business can or will meet all its obligations to us.").

74.     As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses. Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

75.     In other words, should the captive reinsurer choose not to maintain the required funds in the trust (as, upon information and belief, Flagstar decided here), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations—no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

76.     Typically, lenders' captive reinsurance arrangements provide yet another layer of

protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds. If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.

> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

*See* Reinsurance Kickbacks.

77.    Lenders aggressively pursued such arrangements with private mortgage insurers. As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them." *See* Reinsurance Kickbacks.

78.    *American Banker* reported that GE Capital Mortgage Insurance (a predecessor of Genworth) described the lenders' aggressive pursuit as "feeding the beast" in a 1999 Power Point presentation to Citibank obtained by HUD investigators. *See* Reinsurance Kickbacks. In the presentation, Genworth warned that "the MI industry and lenders won't be able to defend/sustain these structures." *Id*.

79.    Captive mortgage reinsurance arrangements such as Flagstar's arrangements with the Private Mortgage Insurers raise obvious RESPA kickback/fee-splitting problems. Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers. The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

23

80.     The Private Mortgage Insurers understood that in order to receive referrals of private mortgage insurance business, and, thus, a steady stream of business from mortgage lenders such as Flagstar Bank, they would have to agree to higher premium cessions and/or kickbacks through reinsurance premiums ceded.   As Genworth noted in its 2004 Form 10-K filing:

> Starting in late 2003, we generally sought to exit or restructure a portion of our excess-of-loss risk sharing arrangements with premium cessions in excess of 25% to improve profitability.  This resulted in a significant reduction in business from several of these lenders and a reduction in the percentage of primary new risk written that is subject to captive reinsurance arrangements.  ***We then re-evaluated these relationships*** on a case-by-case basis, assessing various factors, including ceding terms, attachment points and quality of portfolios.   As a result, we reinstated or restructured some of these arrangements.

*See* Exhibit S hereto at 34-35 (excerpts from Genworth Financial Inc.'s 2004 Form 10-K) (emphasis added).  These "reinsurance" premiums and/or kickbacks paid to mortgage lenders for their referral of business to the Private Mortgage Insurers are kickbacks and/or referral fees in violation of RESPA—pure and simple.

81.     Thus, the Private Mortgage Insurers knew that they had to participate and perpetuate this hidden scheme in order to get more of Flagstar's business, and, as evidenced above, they did.  The Private Mortgage Insurers chose to pay illegal kickbacks and/or referral fees to mortgage lenders such as Flagstar Bank in order to ensure the receipt of ongoing referrals of mortgage insurance business.  *See, e.g.*, Exhibit T hereto at 139 (excerpts from Genworth Financial Inc.'s 2005 Form 10-K, indicating a "decreased demand for mortgage insurance . . . as a reduction in business from some mortgage lenders following our actions to restructure our captive reinsurance arrangements with premium risk cessions in excess of 25%).  *See also* Exhibit U hereto at 66 (excerpts from Radian Group Inc.'s 2005 Form 10-K, noting that, with

respect to its ability to participate in and profit from the mortgage insurance business, Radian's competitors include "mortgage lenders that demand increased participation in revenue-sharing arrangements such as captive reinsurance arrangements.").

82.     As opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described above, to funnel such unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

83.     Each and every premium already ceded to Flagstar by the Private Mortgage Insurers, as well as each and every premium that they will continue to cede to Flagstar in the future, constitutes an illegal kickback and/or referral fee "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).  Each such payment—past, present and future—represents a violation of RESPA on the part of each of the Private Mortgage Insurers in furtherance of the scheme.

84.     As actuarial firm Milliman, Inc. acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to *receiving a commission or profit sharing equal to a percentage of premium*."  *See* Exhibit K (emphasis added).

**HUD's Concern About RESPA Anti-kickback Violations Under Captive Reinsurance Arrangements**

85.     Concerned that captive reinsurance arrangements would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.  *See* HUD Letter, attached

as Exhibit V.

86.     The  HUD  letter  concluded  that  captive  reinsurance  arrangements  were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).  *See* Exhibit V at 3.

87.     The  HUD  letter  focuses  the  RESPA  anti-kickback  analysis  on  whether  the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."  *See* Exhibit V at 3.

88.     The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be  satisfied  by  a  quota  share  arrangement,  under  which  the  reinsurer  is  bound  to participate pro rata in every claim" (emphasis in original).  *See* Exhibit V at 3.[4]

89.     The  HUD  letter  contrasts  the  excess-of-loss  method  of  captive  mortgage reinsurance, stating that excess-of-loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> [I]f the band of the reinsurer's potential exposure is such that a
> reasonable business justification would motivate a decision to
> reinsure that band.  Unless there is a real transfer of risk, no real
> reinsurance services are actually being provided.  In either case,
> the premiums paid . . . must be commensurate with the risk.

---

[4]     As noted above, even quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.  *See* Exhibit L at 14.

*See* Exhibit V at 3. In other words, even if there is some transfer of risk, the reinsurance arrangement will still violate RESPA unless the amount paid (*e.g.,* the premiums ceded) is commensurate with the risk transferred.[5]

**Industrywide Captive Reinsurance Scheme**

90.     Since the mid-1990s, most, if not all, of the country's major mortgage lenders created its own captive reinsurance subsidiary and required each of the nation's major private mortgage insurers to whom it funneled business to enter into virtually identical reinsurance contracts with the lender's captive reinsurer. Lenders only funneled business to those private mortgage insurers who agreed to participate in the captive reinsurance scheme. *See* Mortgage Kickback Scheme. This process was referred to by one beleaguered private mortgage insurer as "feeding the beast." *See* Reinsurance Kickbacks. That same provider even noted that these structures were indefensible. *Id.* Yet, it, and each of the other private mortgage insurers, participated in the scheme, failed to challenge the scheme and failed to bring the scheme to the attention of regulatory authorities.

91.     The charts below reflect the top ten captive reinsurers in the country based on the premiums ceded to the lenders' captive reinsurance subsidiaries and the hundreds upon hundreds of millions of dollars of private mortgage insurance premiums which private mortgage insurers ceded to them from 2004-2010:[6]

---

[5]     As explained above, RESPA is now administered and enforced by the CFPB. *American Banker* recently reported that the CFPB has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme—the same type of scheme described herein. The investigation is the CFPB's first known formal investigation. *See* Jeff Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American Banker (Jan. 10, 2012, 4:31 PM), http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-1.html, attached as Exhibit W.

[6]     *See* Schedule F – Part 3 from the 2004-2010 Annual Statements filed with the NAIC by



As is noted above, the following chart illustrates that these captive reinsurers received 85.7% of

the total reinsurance premiums ceded by private mortgage insurers from 2004 through 2010:



92.     Each and every one of the top ten captive private mortgage insurance reinsurers

(and/or their lender sponsor/parents) identified in the chart above to serve as repositories for

each of the captive reinsurers.  *See also* Exhibit J at 393-398 (listing the top lender captives
based on reinsurance premiums ceded for the years 2005-2010).

ceded premiums/kickbacks have now been sued by consumers who have alleged that captive reinsurance entities were merely vehicles through which the lenders were able to funnel profits in the form of kickbacks while taking on little or no risk. *See Alston v. Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa.) (created Balboa); *Samp v. JPMorgan Chase Bank, N.A.*, No. 11-cv-01950 (C.D. Cal.) (created Cross Country); *Alexander v. Washington Mutual, Inc.*, No. 07-cv-04426 (E.D. Pa.) (created WM Mortgage RE); *Liguori v. Wells Fargo & Co.*, No. 08-cv-00479 (E.D. Pa.) (created North Star); *Menichino v. Citibank, N.A.*, No. 12-cv-00058 (W.D. Pa.) (created CitiMortgage RE and AAMBG Reinsurance);[7] *Riddle v. Bank of America Corp.* (E.D. Pa.); *Thurmond v. SunTrust Banks, Inc.*, No. 11-cv-01352 (E.D. Pa.) (created Twin Rivers);[8] *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.) (created Cap Re); *Munoz v. PHH Corp.*, No. 08-cv-00759 (E.D. Cal.) (created Atrium); *White v. PNC Fin. Services Group, Inc.*, No. 11-cv-07928 (E.D. Pa.) (created National City).

93.    Milliman, Inc. ("Milliman"), an actuarial company which, upon information and belief, provided actuarial services to each (or most) of the top ten lenders and their captive

---

[7]    *See* http://www.secinfo.com/d14D5a.t13Yy.7.htm#1stPage (identifying AAMBG Reinsurance Inc. as a subsidiary of Citigroup Inc.); http://www.riskandinsurance.com/userpdfs/090101_IRR_ Chart.pdf (identifying AAMBG Reinsurance as the captive reinsurer of Citigroup Inc.).

[8]    Indeed, beginning in 1999, several of the nation's major private mortgage insurance providers were sued separately for analogous allegations involving RESPA violations. *See Moore v. Radian Grp. Inc.*, No. 01-cv-00023 (E.D. Tex.); *Mullinax v. Radian Guar. Inc.*, No. 00-cv-01247 (M.D.N.C.); *Patton v. Triad Guar. Ins. Corp.*, No. 00-cv-00132 (S.D. Ga.); *Downey v. Mortg. Guar. Ins. Corp.*, No. 00-cv-00108 (S.D. Ga.); *Baynham v. PMI Mortg. Ins. Co.*, No. 99-cv-00241; *Pedraza v. United Guar. Corp.*, No. 99-cv-00239 (S.D. Ga.). Despite being named in separate actions, several of the private mortgage insurance providers joined together in a "Joint Defense Committee." *See* http://www.analysisgroup.com/cases.aspx?id=279. While some of the cases settled and others were dismissed, those that did settle, settled together and inexplicably included a release for the lenders despite the fact that the lenders had not been named as defendants in the actions. *See* Exhibit W attached hereto (Injunction entered in *Baynham* as part of the settlements); Exhibit Y attached hereto (Preliminary Approval Motion in *Baynham* attaching Settlement).

reinsurers with regards to these captive arrangements, provided a diagram as part of a handout during a 2008 seminar for actuaries, the relevant portions of which are summarized below.  For example, the following chart represents the basic and identical nature of the captive arrangements between and among the lenders, their reinsurance subsidiaries, and the private mortgage insurers:



*See* Private Mortgage Insurance: Beyond Carriers and Actuarial Opinions at 13, Prepared for 2008 Casualty Loss Reserve Seminar ("CLRS") by Milliman, available at: http://www.casact.org /education/clrs/2008/handouts/mrotek.pdf.   *See also* http://www.casact.org/education/clrs/2008/ index.cfm?fa=consess (regarding the 2008 CLRS).

94.    Flagstar RE was in fact the fifteenth top reinsurer by ceded premiums received in 2005. *See* Exhibit J.[9]

---

[9]    It ranked in the top 20 lender captives by premiums received from 2005 – 2009. *Id*.

95.     In fact, Milliman actively promoted the establishment of lender captive mortgage reinsurance entities as a money-making enterprise for mortgage lenders.  *See* Exhibit K.

96.     Upon information and belief, under the terms of the virtually identical reinsurance contracts entered into between private mortgage insurers and each of the top ten lender captive reinsurers in the country, the lenders were protected from any liability beyond their initial capital infusion and bore no real risk.  Most significantly, each of these reinsurance contracts contained "termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision vis-à-vis the parent lender to ensure that the MI reinsured through termination would indeed continue to be reinsured—effectively allowed the reinsurer to opt out of the scheme at its choosing and without suffering adverse consequences.  For instance, in a suit involving the same claims as those raised here against Wells Fargo & Company, Wells Fargo Bank, N.A. and North Star Mortgage Guaranty Reinsurance Company (collectively, "Wells Fargo"), Wells Fargo provided the court with copies of contracts that its captive reinsurer entered into with two of the nation's seven major private mortgage insurers, each of which includes provisions limiting Wells Fargo's exposure to risk.  *See* Revised Reinsurance Agreement (Excess Layer) between Republic Mortgage Insurance Company and North Star Mortgage Guaranty Reinsurance Company, attached hereto as Exhibit Z, at Section 9.03 and Section 12.07; Reinsurance Agreement (Excess Layer) between Radian Guaranty, Inc. and North Star Mortgage Guaranty Reinsurance Company, attached hereto as Exhibit AA, at Section 9.03, Section 12.06; Amendment Dated March 29, 2000 to Reinsurance Agreement (Excess Layer) between Radian Guaranty Inc. and North Star Mortgage Guaranty Reinsurance Company at Section 12.11, attached hereto as Exhibit BB.

97.     When asked to opine on contracts like those cited above with non-recourse and

liability-limiting provisions in the analogous *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296

(E.D. Pa.) action, Andrew Barile, a noted reinsurance industry expert, stated that he had never,

"in all [his] years of experience," seen reinsurance agreements with similar non-recourse/trust

cap terms to those in the reinsurance agreements between the lender captive reinsurer and the

Private Mortgage Insurers.  *See* Defendants' Reply in Support of Motion to Compel Plaintiffs'

Experts to Produce Documents at 7, *Moore v. GMAC Mortg., LLC*, No. 07-cv-04296 (E.D. Pa.

Oct. 12, 2010), ECF No. 144.

98.    Upon information and belief, the private mortgage insurers were selected by the

lenders for each borrower on a rotating or modified rotating basis, without regard for generally

recognized and legitimate business reasons such as price or better service.  In cases challenging

the same scheme as alleged herein against Flagstar, lenders have conceded that a consumer's

private mortgage insurer is selected on a rotating or modified rotating basis.  For instance, in a

similar case brought against Countrywide Financial Corp., its mortgage lender and its captive

reinsurer, the Third Circuit noted:

> Countrywide generally requires borrowers who do not put twenty
> percent down when buying a home to purchase PMI from one of
> seven (now six) PMI providers.  The borrower pays the PMI
> premiums, even though the mortgage lender is the beneficiary of
> the policy, and generally has no opportunity to comparison-shop
> for PMI lenders.  Instead, the PMI provider is selected by the
> lender, here on a rotating basis among the seven providers, all of
> whom had allegedly agreed with Countrywide to reinsure with
> Balboa.

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 at n. 3 (3d Cir. 2009).  *See also* Exhibit CC

attached hereto, excerpts from the March 2, 2010 class certification hearing transcript in *Moore*

*v. GMAC Mortgage, LLC*, No. 07-cv-04296, at 11-13 (acknowledging that the assignment of

borrowers to the private mortgage insurers was done on a rotating basis); *Munoz v. PHH Corp.*,

No. 08-cv-00759 (E.D. Cal.) (Defendants' Reply Memorandum of Points and Authorities in

Support of Motion to Stay) (ECF No. 164) at 2 (stating that the *Munoz* action is "identical" to the *Moore* action); *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.) (Defendants' Reply in Support of Motion to Compel Plaintiffs' Experts to Produce Documents) (ECF No. 144) at 1-2 (noting that all of the captive reinsurance cases are "nearly identical" and that the *Liguori v. Wells Fargo & Co.*, No. 08-cv-000479 (E.D. Pa.) action is "virtually identical" to the *Moore* action).

99.     The lenders, their captive reinsurers, and the private mortgage insurers continued these schemes through at least 2008 in the midst of the unprecedented mortgage crisis.  The "brakes" were only applied to this ongoing scheme after Freddie Mac's announcement that, effective June 1, 2008, it would limit the percentage of premiums a mortgage insurance provider could cede to a lender captive reinsurer to 25%.  *See* Exhibit DD attached hereto (Freddie Mac Private Mortgage Insurer Eligibility Requirements, dated January 2008).  *See also* http://www.freddiemac.com/news/archives/corporate/2008/20080214_capture.html.  This limitation clearly contributed to the decline in profits for lenders and their captives, who, upon information and belief, were receiving a much higher percentage of ceded premiums until that point in time.

100.     These schemes have come under increasing scrutiny in recent years and have been the subject of subpoenas from states, including Minnesota and New York, as well as the Consumer Financial Protection Bureau and HUD.  *See, e.g.*, Exhibit EE attached hereto (excerpt from Genworth Financial Inc.'s 2008 Annual Report at 54, explaining that its various U.S. mortgage insurance subsidiaries received information requests from the State of New York Insurance Department, the Minnesota Department of Commerce, and HUD); Exhibit FF attached hereto (excerpts from Radian Group Inc.'s 2009 Form 10-K at 60-61, explaining that Radian and other mortgage insurers have been subject to multiple inquiries from the Minnesota Department

of Commerce relating to their captive reinsurance arrangements, and Radian has also received a subpoena from the Office of the Inspector General of HUD, requesting information relating to captive reinsurance); Exhibit W (American Banker recently reported that the CFPB, which now administers and enforces RESPA, has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme).

101.    As a result of the participation of the lenders, their captives, the Private Mortgage Insurers and third-parties such as Milliman, in this singular scheme, mortgage insurance premiums increased as the entire market was severely impacted.  Consumers paid more for mortgage insurance because the price included the kickbacks to lenders.

**Flagstar's Captive Arrangements With the Defendant Private Mortgage Insurers**

102.    During the Class Period, in connection with the billions of dollars in home loans originated, funded and/or originated through correspondent lending by Flagstar Bank, *see* Exhibit D, many of their borrowers paid for private mortgage insurance.

103.    Also during the Class Period, Defendant Flagstar RE was a party to captive reinsurance arrangements with each of the Defendant Private Mortgage Insurers.  Pursuant to these arrangements, Flagstar Bank referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance or other appropriate metric among, the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with Flagstar RE under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to Flagstar RE.  Flagstar Bank and Flagstar RE, in coordination with the Private Mortgage Insurers, acted together over time to effectuate this single scheme which caused harm to Plaintiffs and each and every Class member.  Upon information and belief, the Private Mortgage Insurers participated in

34

the scheme simply because the lenders produced business for them and they would not have access to the significant lenders if they did not agree to participate in the reinsurance arrangements.   Notably, upon information and belief, each of the Private Mortgage Insurers participated without demur and not one attempted to put an end to the lenders' activities by reporting the conduct to the authorities.   Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiffs and the Class.   *See generally*, 12 U.S.C. § 2601(b).   Graphically, this unified scheme is depicted as follows:



104.   Upon information and belief, Flagstar RE entered into reinsurance contracts solely with respect to loans originated, funded, and/or originated through correspondent lending by Flagstar Bank, or any of their subsidiaries and/or affiliates, during the Class Period.  Further, such agreements were in the form of aggregate excess-of-loss reinsurance contracts or "purported" quota share reinsurance contacts.  *See* Exhibit GG hereto (OCC Manual at 63);

Exhibit HH hereto (OCC Interpretive Letter #743).[10]

105.    Upon information and belief, under each of Flagstar's excess-of-loss or "purported" quota share captive reinsurance arrangements, the Defendant Private Mortgage Insurer pays Flagstar RE a percentage of the premiums paid by borrowers on a particular pool of loans; in return, Flagstar RE purportedly agrees to assume a portion of the insurer's risk of loss with respect to the loans involved.

106.    In fact, each of Defendants' carefully-crafted reinsurance contracts does not provide for "real transfer of risk" and, under any analysis, are not "commensurately" priced.

107.    Upon information and belief, under its reinsurance contracts, Flagstar RE established a separate trust fund for each Private Mortgage Insurer into which the Private Mortgage Insurer deposited the contractually-determined ceded portions of the premiums that it collected from borrowers.  Upon information and belief, Flagstar RE is facially required, pursuant to its contracts with the Private Mortgage Insurers, to maintain through, *inter alia,* capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.

108.    Upon information and belief, for the reasons described above, Flagstar RE's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for the mortgage insurer—effectively insulating Flagstar from liability for

---

[10]    Upon information and belief, Flagstar entered into at least one quota share reinsurance arrangement with Defendant Mortgage Guaranty Insurance Corp.  *See* http://phx.corporate-ir.net/phoenix.zhtml?c=117240&p=irol-reportsAnnual, 2010 Annual Report at 20 (noting that, effective January 1, 2009, Mortgage Guaranty Insurance Corp. no longer cedes new business under excess-of-loss reinsurance treaties with lender captive reinsurers and that all new business will continue to be ceded under quota share reinsurance arrangements). *Cf.* n.4 and n.5 supra (explaining why such quota share arrangements would be unlawful under the circumstances described herein).

failing to maintain the trusts adequately to pay claims and leaving the Private Mortgage Insurers with no recourse.

109.   Consequently, Flagstar's captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between Flagstar RE and the Defendant Private Mortgage Insurers.

110.   As HUD noted during testimony by Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

See Exhibit II hereto (April 26, 2006 testimony of Gary M. Cunningham).

111.   Such is the case with Flagstar.   As reflected in the table below, from the beginning of 2004 through the end of 2010, Flagstar RE collected from the Private Mortgage Insurers at least **$32.5** million as its "share" of borrower's private mortgage insurance premiums. In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was less than $440,000, as depicted in the chart below:[11]

---

[11]   These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2010.   Plaintiffs' investigation is ongoing.   *See also* Exhibit J at 391-398, (indicating that from 2005 through 2010 Flagstar RE collected over $28 million in ceded premiums from the Private Mortgage Insurer Defendants, and ranged from the fifteenth to eighteenth  largest captive reinsurer by ceded premiums collected).



112.    As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse." *See* Reinsurance Kickbacks.

113.    Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history.  *See, e.g.,* Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown,* CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit JJ.   Thus, it is not at all surprising that relatively small amounts of claims were paid from the trusts during 2008 through 2010.

114.    Further, such paid "claims," as discussed herein, do not establish that the reinsurance contracts at issue constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.  Upon information and belief, even after paying some claims during 2009 and 2010, due to the *structure* of the reimsurance agreements, Defendants continued to carry no true risk of loss and the premiums received by Flagstar RE far exceeded any risk that Flagstar RE purportedly assumed.

115.    Payments from the reinsurance trusts to the Private Mortgage Insurers do not constitute "losses" to the reinsurer.  The reinsurer will either: (1) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in "reinsurance claims"; or (2) have the option to "walk-away" from its reinsurance obligations if it is called upon to pay more in reinsurance claims than is available in the trust accounts.  The premiums received and deposited into the trust accounts effectively cover all "losses" or reinsurance claims payments.

116.    Under accepted accounting and actuarial principles, in order for a contract to be treated as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* Exhibit M at 282-83; *see generally* Exhibit N at 7.

117.    Insurers and reinsurers are subject to two sets of accounting standards in the United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting principles (GAAP)."  *See* Exhibit KK hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk Financing in the US and the EU: A Comparative Analysis of Alternative Regulatory Approaches*, The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state insurance regulators through the NAIC, and insurers are required to file detailed financial statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission (SEC) reports."  *Id.*

118.    FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that

have the formal appearance of reinsurance but do not transfer significant insurance risk and this should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting." *See* Exhibit M at 282-83.

119.    Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

1.    It must be evident that 'the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts' (paragraph 11), or

2.    The reinsurer must 'assume significant insurancr risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b).

*Id*. at 283; *see generally* Exhibit N at 7.   Given the trust cap limitation and other risk/liability/recourse limiting features in each of Defendants' reinsurance contracts, only the second test identified by FAS 113 is relevant here.   Indeed, the first test is viewed as an exception to the second.  *See* Exhibit M at 283.  The "primary" test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if:

a.    The reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts, and

b.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit N at 7.

120.    Further, FAS 113 provides the blueprint for how to structure a "real risk transfer"

41

analysis:

> The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized. The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.

> Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value of the amounts paid . . . to the reinsurer.

*Id.* at 7.

121.    SSAP 62R's test for whether real risk transfer is found in a reinsurance contract is substantively identical:[12]

> 1.    The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and

> 2.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit LL ¶ 13 hereto, SAP 62R-6 (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Exhibit A "Implementation Questions and Answers).[13]

122.    Reinsurance "[c]ontracts that do not result in the reasonable possibility that the

---

[12]    "The above provisions of SSAP 62 are essentially the same as those in FAS 113." *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, available at http://www.actuary.org/pdf/casualty/risk_transfer.pdf.

[13]    *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably possible if its probability is more than remote.").

reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits."  *See* Exhibit L at 4; *see generally* Exhibit MM hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

123.    In a deposit accounting/no risk transfer arrangement, loss to the Private Mortgage Insurer is not equivalent to loss to the reinsurer—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit accounting/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Risk transfer does not equate "loss" to the reinsurer with "loss" to the Private Mortgage Insurers in a deposit/no risk transfer arrangement—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Payment of "claims" under a "deposit accounting"/reinsurance contract is not an infrequent or unusual event.  Rather, it is specifically anticipated, and accounting of such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules.  *See* Exhibit JJ at paragraph 35, SAP 62R-11 at b (referencing "disbursements"); e (referencing "settlement of losses"); and f (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit NN hereto (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph b, referencing "disbursements"; paragraph d, referencing "settlement of losses"; and paragraph e, referencing loss and loss adjustment expense)).

124.    As set forth above, the risk transfer evaluation does not end at the first "claim" payment from each reinsurance trust to a Private Mortgage Insurer.  The HUD Letter phrase that "there is no reasonable expectation that the *reinsurer* will ever have to pay claims" does not

mean that when the *first claim* is paid out of a reinsurance trust, real risk is transferred. *See* Exhibit V at 6 (emphasis added). That *first claim*, by definition, would be paid out of the premiums placed into the trust by the ceding Private Mortgage Insurer. The *reinsurer* only pays after ceded premiums are exhausted. The "reinsurer" does not pay "claims," or suffer "losses" under a reinsurance arrangement in a risk transfer sense, until its own capital is utilized, and not "repaid" through dividends or otherwise. Until then, the reinsurance trusts are just returning ceded premiums paid by the Private Mortgage Insurers.

125.   To the extent, then, that claims have been made from the reinsurance trusts under Flagstar RE's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish a *bona fide* risk-transferring reinsurance arrangement nor does it establish that Defendants have suffered a true reinsurance "loss." In fact, the structure and missing essential terms of the reinsurance contracts themselves negate any exposure to reinsurance losses rendering the arrangements a sham.

126.   Indeed, at least one state regulator explicitly concluded, that no real transfer of risk exists where reinsurance agreements include liability limiting provisions or lack sufficient recourse pursuant to the contract to ensure that the reinsurer lives up to its commitments. The State of Arizona Department of Insurance, in a statement (E-MG.CEDE–Rev. 12/09) discussing the filing by mortgage insurers of certain schedules with the state, made clear its view that mortgage reinsurance arrangements:

- that had unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds,

result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines." *See* Exhibit OO hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers).

127.    As *American Banker* observed, "the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks." *See* Reinsurance Kickbacks.

128.    The over $32 million dollars paid by the Defendant Private Mortgage Insurers and collected by Flagstar through its captive reinsurer from the beginning of 2004 through the end of 2010 have clearly not been commensurate to its actual risk exposure.  The Defendant Private Mortgage Insurers have paid, and Flagstar has received, over $32 million dollars in ceded premiums, while Flagstar has borne little or no risk of loss.

129.    In reality, Defendants' captive reinsurance arrangements were and are sham transactions providing for the transfer of kickbacks and unearned fees in violation of RESPA.

130.    The money which Flagstar collected from the Defendant Private Mortgage Insurers through Flagstar RE far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer.  The amounts paid were simply disguised kickbacks to Flagstar for the referral of borrowers to the Defendant Private Mortgage Insurers.

131.    These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other

45

words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.[14]

132.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers and in contravention of the stated purpose of RESPA.

### CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Flagstar Bank, or any of their subsidiaries and/or affiliates, between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Flagstar's captive mortgage reinsurance arrangements (the "Class").

134.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

135.    The Class is so numerous that joinder of all members is impracticable.

136.    A class action is superior to all other available methods for the fair and efficient

---

[14]    Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed.  "Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded. *See* Reinsurance Kickbacks.

adjudication of this controversy.

137.    Plaintiffs' claims are typical of the claims of the Class.

138.    There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

a.    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

b.    Whether payments to Flagstar RE were *bona fide* compensation and solely for services actually performed;

c.    Whether payments to Flagstar RE exceeded the value of any services actually performed;

d.    Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

e.    Whether Flagstar accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

f.    Whether the Private Mortgage Insurers paid or gave referral fees to Flagstar or a portion, split or percentage of borrowers' private mortgage insurance premiums to Flagstar other than for services actually performed; and

g.    Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

139.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.  The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific,

individual consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools of loans.  Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their Flagstar Bank loan, to pay for private mortgage insurance. Each and every Class member was directed to obtain private mortgage insurance from one of the Defendant Private Mortgage Insurers—each of whom had reinsurance contracts with Flagstar RE, structured as challenged here, to purchase "reinsurance" on that private mortgage insurance. The essential and basic terms of each of those "reinsurance" contracts between Flagstar RE and the Defendant Private Mortgage Insurers were, for all intents and purposes, materially the same—and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm, entitling them to demand the same statutory damages. Accordingly, this is the quintessential consumer class action lawsuit.

140.    The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded by Flagstar Bank or originated through correspondent lending.  Regardless of whether Flagstar Bank or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

141.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

142.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of

inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

143.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

144.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## TOLLING OF THE STATUTE OF LIMITATIONS

145.   Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  For Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and clearly should apply.  Plaintiffs and members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

146.   Due to the complex, undisclosed and self-concealing nature of Defendants'

scheme to provide for the payment of illegal kickbacks from the Private Mortgage Insurers to Flagstar, Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

147.    As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance contracts*, another RESPA violation."  *See* Reinsurance Kickbacks (emphasis added).  In fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id.*

148.    This complex action is dissimilar to a simple type of RESPA case where, for example, an attentive borrower may determine—from a careful examination of his HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider.  Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow that is intentionally concealed through affirmative misrepresentations about the nature and *bona fides* of Defendants' reinsurance arrangements.

149.    Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.[15]  Plaintiffs and the putative Class members had no basis

---

[15]     Thus, only with the aid of counsel, were Plaintiffs able to obtain any information regarding the likely reinsurance of their mortgage insurance. In their attempts to confirm (as set forth herein) the reinsurance of their mortgage insurance, the Plaintiffs, with either their lender,

upon which to investigate the validity of the undisclosed payments from the Defendant Private Mortgage Insurers to Flagstar RE for purported reinsurance. Plaintiffs' and the putative Class members' "purported" delay was excusable because they did not discover, and reasonably could not have discovered, Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

150. Once Plaintiffs discovered the underlying basis for the claims alleged herein with the assistance of counsel, they contacted Flagstar in an effort to obtain further information about the reinsurance of the private mortgage insurance on their loans, as well as to obtain further information about the reinsurance of their private mortgage insurance and to ask that their loans be removed from Defendants' captive reinsurance program. None of the employees with whom Plaintiffs spoke had any specific knowledge of Defendants' reinsurance program.

151. Plaintiff Hill first contacted Flagstar through their customer service line on April 11, 2012. Ms. Hill spoke with a customer service representative named "Suktl" who was completely unfamiliar with Flagstar's captive reinsurance program. Suktl placed Ms. Hill on extended hold, and, when he returned, advised Ms. Hill that he would transfer her call to a different department that "may" be able to answer her question. However, rather than transfer Ms. Hill, Suktl disconnected the call. In an effort to obtain further information regarding the reinsurance of the private mortgage insurance on her loan and to remove her loan from Defendants' captive reinsurance program, Ms. Hill again contacted Flagstar on April 11, 2012

---

or mortgage insurance provider, with the assistance of counsel (in a protracted email correspondence beginning on May 4, 2012 with Radian and on May 10, 2012 with MGIC), were unsuccessful in obtaining 1) any coherent or responsive information from their lenders; and 2) their counsel were stonewalled by counsel for their mortgage insurance providers regarding the reinsurance of the Plaintiffs' mortgage insurance, notwithstanding Plaintiffs' inherent right to this information and the mortgage insurers' duty to provide this information to Plaintiffs/Insureds.

and spoke with a customer service representative named "Digeyte."  Digeyte indicated to Ms. Hill that she knew nothing about "captive reinsurance" and could provide Ms. Hill with no further information.

152.   Plaintiff Taylor first contacted Flagstar through their customer service line on May 8, 2012.  Ms. Taylor spoke with a customer service representative named "Khtia" who acknowledged that she had no idea what Ms. Taylor was referring to regarding "captive reinsurance."  Khtia then transferred Ms. Taylor to another customer service representative named "Aisha" at "extension 9214."  Similar to Khtia, Aisha possessed no information or knowledge of Flagstar's captive reinsurance program and could not answer any of Ms. Taylor's questions.  Aisha then put Ms. Taylor on extended hold to speak with a manager, and when Aisha returned to the line, informed Ms. Taylor that her manager similarly had no idea what captive reinsurance was and could provide no information.

153.   Plaintiff Vanessa Heimbach first contacted Flagstar through their customer service line on May 10, 2012.  Mrs. Heimbach spoke to a customer service representative named "Randy" who informed Mrs. Heimbach that he did not understand her question because he did not know what captive reinsurance was.  Randy then noted that Mrs. Heimbach's Flagstar loan did have mortgage insurance on it.  Mrs. Heimbach further explained that her questions surrounded captive reinsurance, not the mortgage insurance itself.  Randy then stated that Flagstar had performed an "audit" in 2011 and that Mrs. Heimbach was not entitled to a refund on any mortgage insurance premiums.  Mrs. Heimbach once again explained that her query had to do with captive reinsurance, not the mortgage insurance itself.  Randy then offered to provide Mrs. Heimbach with the telephone number to the Federal Housing Administration, suggesting that perhaps they could answer her query, until realizing that Mrs. Heimbach possessed a

conventional, rather than an FHA, loan.  Finally, Randy submitted a "work order," numbered 8519679, regarding her query and stated that someone from Flagstar would return her call within three (3) to seven (7) business days.  To date, Mrs. Heimbach has received no return call regarding her captive reinsurance query.

154.    Further, Defendants engaged in affirmative acts and/or purposeful non-disclosure to conceal the facts and circumstances giving rise to the claims asserted herein and made false representations about the nature of its reinsurance arrangements.  Such acts are separate and distinct from the conduct violative of RESPA.

155.    Flagstar used its form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer, Flagstar RE, and the lender, Flagstar Bank, and to represent that, rather than a kickback or unearned fee, any payments exchanged between the affiliated businesses, or given to them from the Private Mortgage Insurer Defendants through referral, were for actual services rendered.

156.    Even when some industry analyst and ratings agencies questioned the captive reinsurance deals, banks *and* insurers publicly maintained that they met the standards set forth in the HUD letter.  *See* Reinsurance Kickbacks.

157.    Upon information and belief, Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators.  As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off on the structures.  To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.
>
> Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable

to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

158.    Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of Flagstar's captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert. Clearly, a mortgage provision stating that Flagstar ***may*** enter into captive reinsurance relationships (*see* Exhibit PP ¶ 10 (Plaintiff Hill's and Scheme's Mortgage); Exhibit QQ ¶ 10 (Plaintiff Taylor's Mortgage); Exhibit RR ¶ 10 (Plaintiff Heimbachs' Mortgage)) is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated.  Similarly, a notice that states that Flagstar may receive a financial benefit does not put the average homebuyer on notice of any improper or illegal conduct either.  *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").  If it is at least arguable that HUD—the agency tasked with enforcing RESPA—did not have the requisite expertise to fully vet these claims even after they were brought to their attention, how could a layperson ever be expected to have knowledge of such a complex, hidden claim after merely reading his or her settlement documents, including, for example, the HUD-1 statement.  This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

159.    Likewise, even a disclosure that states that an affiliated reinsurer will assume some portion of the risk associated with Mortgage Insurance a borrower's loan is insufficient to

put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated, especially given that the affirmative misrepresentations as to transfer of risk in such disclosure.

160.    Similarly, it is beyond unrealistic to expect members of the putative Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurer Defendants did not begin until around 2007, years after the transactions came into existence.  *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

161.    Flagstar intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them on notice of the underlying basis for their claims and affirmatively misrepresent the nature of Defendants' conduct.  The putative class members were not put on notice of Flagstar's wrongdoing.  For instance, Flagstar did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by Flagstar RE.  Moreover, the form disclosures provided to Plaintiffs note only that if mortgage guaranty insurance coverage is reinsured through an affiliate of Flagstar Bank, that lender affiliates of the reinsurer "may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's Payment's for Mortgage Insurance" (*see* Exhibits PP ¶ 10, QQ ¶ 10 and RR ¶ 10), and that the reinsurance arrangement will not "increase" the borrower's mortgage guaranty insurance premiums.  *Id*.

162.    Defendants' alleged and ubiquitous misrepresentations about the legitimacy of

their captive reinsurance arrangements as *bona fide* in various standardized mortgage and closing documents are separate and distinct acts of concealment that misled Plaintiffs and members of the putative Class.

163.    Further, upon information and belief, Flagstar RE and other captive reinsurance companies incorporated in "captive-friendly" states are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies.  *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached as Exhibit SS hereto ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator."); *see also* Mortgage Kickback Scheme (noting that Vermont ranks among the world's top three domiciles along with Bermuda and the Cayman Islands).  Indeed, Flagstar moved its captive reinsurer from Michigan to the "captive friendly confines" of Vermont in 2007.  Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on Flagstar's captive reinsurer.  One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

164.    HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

*See* Mortgage Kickback Scheme (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not

conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

165.    Putative Class members exercised due diligence by fully participating in their loan transactions.  Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

166.    Flagstar provided misleading and false information to Plaintiffs and the Class, thus affirmatively acting to conceal their unlawful kickback scheme.  By funneling kickbacks through Flagstar RE and representing that such payments were for services actually performed, rather than referral fees, Flagstar acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.  Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Violation of RESPA, 12 U.S.C. § 2607)

167.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

168.    Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

169.    Plaintiffs and the Class obtained federally-related residential mortgage loans through Flagstar Bank and collectively paid over $32 million dollars for private mortgage insurance premiums in connection with their real estate closings during the class period.

170.    The amounts paid by the Defendant Private Mortgage Insurers and accepted by Flagstar through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

171.    Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Flagstar RE under carefully crafted reinsurance contracts as hereinabove described.

172.    These ceded premiums: (a) were not for services actually furnished or performed and/or (b) exceeded the value of such services.

173.    The millions of dollars paid by the Defendant Private Mortgage Insurers and accepted by Flagstar through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between Flagstar RE and the Defendant Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

174.    In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave, and Flagstar accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by the Defendant Private Mortgage Insurers and accepted by Flagstar through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by Flagstar's customers.

Flagstar RE participated in the scheme and served as the direct party to which the split was paid. Flagstar RE agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and the Class.

175.    Plaintiffs and the Class were subjected to settlement services and/or business incident to real estate settlement services tainted by naked kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme, which involved major providers of private mortgage insurance in the United States.  Flagstar's reinsurance arrangements with the Defendant Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

176.    First, Plaintiffs and the Class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress bestowed upon Plaintiffs and the Class a right to a real estate settlement free from unlawful kickbacks and unearned fees and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge.  *See* 12 U.S.C. §§ 2601, 2607(d)(2).  Plaintiffs allege that the Defendant Private Mortgage Insurers have given, and Flagstar has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or service charges for business incident to real estate settlement services— private mortgage insurance premiums—in violation of RESPA.  Defendants' scheme resulted in a limitation on both settlement service choice and competition.  Flagstar eliminated competition among providers of private mortgage insurance by requiring its borrowers to purchase private mortgage insurance from one of the Defendant Private Mortgage Insurers with whom it had an

arrangement.   Upon information and belief, referred borrowers were allocated to one of the Private Mortgage Insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in return for a referral fee.   The referral fee included no evaluation of price, quality, service provided, reputation, performance or any other aspect of the product provided by any of the Private Mortgage Insurers receiving the referrals.   Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.   Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.   *See Carter v. Welles-Bowen Realty, Inc.,* 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

177.   Second, though not necessary to prevail on their claims, Plaintiffs and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.[16]   Congress has already determined that the ***aggregate*** effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.   *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement

---

[16]   The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge."   *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

services.").  Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.  Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to Flagstar RE that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

178.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.  *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

179.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. 2607(a) and (b).  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

180.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seeks attorneys' fees and costs of suit.

## COUNT TWO

## (COMMON-LAW RESTITUTION/UNJUST ENRICHMENT)

181.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

182.    Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants.  During the Class Period, the Defendant Private Mortgage Insurers collected and wrongfully paid to Flagstar tens of millions of dollars as Flagstar's unlawful split

or share of the private mortgage insurance premiums paid by Plaintiffs and the putative Class members.

183.   The amounts collected and ceded to Flagstar RE as purported reinsurance premiums were accepted and retained by Flagstar under circumstances such that it would be inequitable for Flagstar to retain the benefit without payment to Plaintiffs and the Class.

184.   The Private Mortgage Insurers were guaranteed a steady stream of business in return for ceding portions of the premiums they received from borrowers with respect to the loans involved in Defendants' captive reinsurance scheme, and they were unjustly enriched through receipt of this guaranteed stream of business.

185.   As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

186.   Further, Plaintiffs and the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.     Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.     Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.      Awarding Plaintiffs and the Class statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.      Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.      Granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

F.      Granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

Dated: May 18, 2012                    Respectfully submitted,

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

By: *JHM6596*
Joseph H. Meltzer ((PA80136)
Edward W. Ciolko
Terence S. Ziegler (PA 310318)
Donna Siegel Moffa (PA 310991)
Amanda R. Trask (PA 57973)
Joshua C. Schumacher (PA 200142)
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &**
**BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: May 18, 2012                    Respectfully submitted,

                                       **KESSLER TOPAZ
                                       MELTZER & CHECK, LLP**

                                       By: *JHM6596*
                                       Joseph H. Meltzer ((PA80136)
                                       Edward W. Ciolko
                                       Terence S. Ziegler (PA 310318)
                                       Donna Siegel Moffa (PA 310991)
                                       Amanda R. Trask (PA 57973)
                                       Joshua C. Schumacher (PA 200142)
                                       280 King of Prussia Road
                                       Radnor, PA  19087
                                       Telephone: (610) 667-7706
                                       Facsimile: (610) 667-7056

                                       **BRAMSON PLUTZIK MAHLER &
                                       BIRKHAEUSER LLP**
                                       Alan R. Plutzik
                                       2125 Oak Grove Boulevard, Ste. 120
                                       Walnut Creek, California 94598
                                       Telephone: (925) 945-0200

                                       **BERKE, BERKE & BERKE**
                                       Andrew L. Berke
                                       420 Frazier Avenue
                                       Chattanooga, Tennessee 37402
                                       Telephone: (423) 266-5171

                                       ***Attorneys for Plaintiffs and the Proposed
                                       Class***